1 | Herman Franck, Esq. (SB #123476)
Elizabeth Vogel, Esq. (SB #245772)
2 | **Franck and Associates**
1801 7th Street, Suite 150
3 | Sacramento, CA 95811
Tel. (916) 447-8400
4 | Fax (916) 447-0720

5 | Attorney for Plaintiff
6 | NICOLOSI DISTRIBUTING, INC.

7

8 | **UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10 | NICOLOSI DISTRIBUTING, INC., | Case No. CV-10-3256-SI

11 | | **PLAINTIFF'S DISCLOSURE OF**
**EXPERT WITNESSES**
12 | Plaintiff,

13 | vs.

14

15 | BMW OF NORTH AMERICA, LLC.,

16 | Defendant.

17

18

19

20

21 | Plaintiff Nicolosi Distributing, Inc. herewith submits the following Disclosure of Expert Witnesses

22 | and discloses the following expert witness:

23

24

25

26

27

28

1

**1. Dr. Daniel E. Ingberman**
c/o East-West Economics, 2887 College Ave. #121, Berkeley, CA 94705
Tel: 510-848-4615; e-mail: daniel@ingberman.com

Dr. Ingberman holds a PhD in Economics from Carnegie-Mellon University, Tepper School of Business. His written report and curriculum vitae is attached hereto as Exhibit A.

Areas of testimony and opinions: Dr. Ingberman will provide expert economics testimony concerning the validity of the allegations set forth in the Third and Fourth Claims for Relief, excerpts of which are attached hereto as Exhibit B [First Amended Complaint, pages 7-19, Exhibit B hereto]. Dr. Ingberman will give expert economics opinions regarding the definition of the market for purposes of assessing whether BMW North America LLC possesses monopoly power in the market for certification of collision centers.

Dr. Ingberman will give expert economics opinions regarding the issues of whether the restraint of trade or tying arrangements instituted by BMW are reasonable or unreasonable, in light of the circumstances detailed in the First Amended Complaint [See Exhibit B, excerpts of the First Amended Complaint].

Dr. Ingberman will give expert economics opinions on the overall impact of BMW's paint program, the extent of its restraint on trade, and how the restraint on trade is damaging to competition in the automotive paint industry, and the ill effects of the damage to competition in the automotive paint industry.

Dr. Ingberman charges $675.00 per hour for deposition time, which is the same hourly rate that he charges plaintiff for his preparation in this matter.

1

2   Dr. Ingberman is sufficiently familiar with the issues of this case for which he will provide expert

3   testimony on, and will be able and willing to submit to a meaningful oral deposition concerning

4   the specific testimony, including any opinion in his basis, that he is expected to give at trial.

5

6   Dr. Ingberman has agreed to testify at the trial as an expert witness.

7

8

9

10  Respectfully submitted,

11

12                                                      Date: April ___, 2011

13  Herman Franck, Esq.
    Elizabeth Vogel, Esq.
    Attorney for Plaintiff
14  NICOLOSI DISTRIBUTING, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## LIST OF EXHIBITS

2

3    Exhibit A: Report and Curriculum vitae of Dr. Daniel Ingberman

4    Exhibit B: Excerpts from First Amended Complaint

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXPERT REPORT OF DANIEL E. INGBERMAN

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Nicolosi Distributing, Inc.,
Plaintiff,

Vs.

BMW of North America, LLC,
Defendant.

Case No.  CV-10-3256

**April 1, 2011**

**THIS REPORT MAY CONTAIN INFORMATION DESIGNATED BY THE PARTIES AS**
# CONFIDENTIAL

Expert Report of Daniel E. Ingberman                                    1

## Table of Contents

I. BACKGROUND AND QUALIFICATIONS...........................................................................2

II. OVERVIEW OF THIS DISPUTE ...................................................................................4

III. ASSIGNMENT ...............................................................................................................5

IV. SUMMARY OF OPINIONS ...........................................................................................6

## Expert Report of Daniel E. Ingberman

## I. BACKGROUND AND QUALIFICATIONS

1.      I am Daniel E. Ingberman. I provide expert economic consulting services in my capacity as Senior Consultant at Compass Lexecon, an economics and finance consulting and expert services firm.  I also consult through a number of other entities, including The RND Group and East West Economics.

2.      Plaintiffs and defendants have retained me as an expert economist in matters involving intellectual property, antitrust, complex business disputes, and other situations where it is necessary to assess the economic impact of a particular policy or conduct. I have developed my own independent analyses as well as reviewed and commented on the analyses offered by other experts.  I have presented my opinions in the form of expert reports, declarations, and/or testimony.  In intellectual property matters, I have analyzed and consulted on issues related to patent infringement and misuse, trademark infringement, copyright infringement, and theft or misappropriation of intellectual property.  In antitrust matters, I have analyzed and consulted on issues including mergers/acquisitions, monopolization, vertical restraints, price discrimination, price fixing, patent misuse, and especially, cartels and conspiracies, and in so doing, frequently assess market definition and the likely impact on competition and commerce of business conduct or changes in market organization.  I have also computed damages and/or analyzed other experts' damage assessments in a wide variety of antitrust, intellectual property, and commercial disputes, including matters alleging unfair, wrongful, and/or deceptive competition under state or Federal law, including matters alleging violations of the Lanham Act and state competition laws.

3.      Often my analysis has taken the form of estimating the economic value of an injury or gain due to alleged wrongful conduct (i.e., what is commonly known as the computation of "damages" or "unjust enrichment," including lost profits and reasonable royalties).  In other settings, I have assessed the reasonableness of business decisions and/or the process that led to those decisions, including issues related to performance in contractual settings and/or the impact

of policy changes.  I have also served as an expert in the economic analysis of punitive damages.

4.     Attachment A contains my resume detailing my education, publications, academic appointments, consulting affiliations, and, a list of my testimony for the past four years.  I hold a Ph.D. in Economics, awarded in 1986 by The Tepper School of Business at Carnegie Mellon University.  In addition to the Ph.D., I also hold the M.S. degree in Economics, awarded by Tepper in 1983 and an A.B. degree from Duke University awarded in 1981, where I majored in Economics and in History and was inducted into Phi Beta Kappa.

5.     I have been teaching at the University of California, Berkeley since 2001.  Beginning in 2001, I held the position of Visiting Associate Professor at the Haas School of Business, where I taught graduate business students in my MBA classes, "Economic Analysis for Business Decisions" and "Competitive Strategy and Corporate Strategy."  In addition, at Berkeley I have also been teaching "Law and Economics I," and "Law and Economics II," which are both large undergraduate courses (each about 100 students) in Legal Studies (LS 145, LS 147).

6.     I also hold the position of Adjunct Professor of Managerial Economics at the Olin School (Washington University in St. Louis), where I also previously taught as a Visiting Associate Professor and later as an Associate Professor.  Prior to my appointment at Olin, I taught at the Wharton School (University of Pennsylvania, as an Assistant Professor) and at the Graduate School of Industrial Administration (Carnegie Mellon University, as a Lecturer).

7.     My teaching and research interests span a broad range of subject matters, including but not limited to: the economics of legal rules and institutions; econometrics and statistics; public economics; and industrial organization, business strategy, and competition policy. Courts I have taught include: Competitive and Corporate Strategy; Economic Analysis of Law; Macroeconomics; Managerial Economics; Microeconomics; Research Methods; Political Analysis and Political Economy; Political, Regulatory, Legal and Market Environment of Business and Determinants of Business Strategy; Public Economics; Public Policy; Social Choice and Social Justice; Economics of Torts and Products Liability; Economics of Damages, including Punitive Damages; and, Litigation Strategy and Settlement Incentives.  I have taught undergraduate, MBA, professional MBA, executive MBA, and Ph.D. students.  I have won

teaching awards (at both Wharton and Olin) and received a Dean's commendation for my teaching at Haas.

8.        As detailed in my resume, I have authored or co-authored more than 20 published peer-reviewed academic articles.  My scholarly research is ongoing, and covers a variety of areas.  In some of my articles, I evaluate the economic impact on firms, consumers, and markets of a possible change in their environment (including changes in market conditions, public policies or legal rules).  A number of my papers analyze the specification of compensatory and non-compensatory damages (including punitive damages) in the context of products, security, and/or environmental liability settings.  Other papers investigate economic incentives to settle vs. litigate.  My scholarly research has been presented in a variety of academic and non-academic settings, including conferences, faculty workshops, legislative hearings, and professional presentations. I have served as independent referee in reviewing articles for major journals and supervised Ph.D. research, teaching, and dissertations.

9.        My hourly rate is $675 per hour.  I have no financial interest in the outcome of this matter.

## II. OVERVIEW OF THIS DISPUTE

10.        I understand that this dispute arose after BMW of North America (hereinafter, "BMW") required that "BMW-certified" repair facilities to exclusively use paint purchased from BMW.[1]

11.        In 2005, German Motors aka BMW of SF (hereinafter, "German Motors") had entered into a seven-year "exclusive" purchase agreement with Nicolosi Distributing (www.nicolosipbe.com, hereinafter "Nicolosi"), an authorized distributor of DuPont Paints sold under the DuPont, Spies Hecker, and Nason brands.  Pursuant to this agreement, I understand that German Motors purchased substantial amounts of DuPont automotive paints and accessories from Nicolosi.  I understand that Nicolosi averaged about $60,000 in monthly sales

---

[1] United States District Court for the Northern District of California, Nicolosi Distributing Inc., Plaintiff, vs. BMW of North America, LLC., Defendant, "First Amended Complaint for Interference with Contract, Interference with Prospective Economic Advantage, Violation of Business and Professions Code Section 17200; Violation of Business and Professions Code Section 16727 and Illegal Restraint of Trade In Violation of Business and Professions Code Section 16726," (hereinafter, "Complaint"), p. 4.  See also Deposition of Jeff Burton, December 15, 2010 (hereinafter, "Burton Deposition"), pp. 56-57, 85, 103, 163-65, 212-13.

CONFIDENTIAL

to German Motors before BMW imposed its requirement that BMW-certified dealers purchase paint for BMWs only from BMW.[2]

12.     I understand that German Motors also repairs non-BMW cars, and German Motors uses both the proprietary BMW ColorSystem equipment (including a scale, a computer, and a machine that mixes the paint) as well as the Spies Hecker equipment.  I also understand that Nicolosi continues to supply paint (for non-BMW cars) and accessories to German Motors at the rate of $20,000 to $30,000 per month.[3]

## III.  ASSIGNMENT

13.     Counsel for plaintiff Nicolosi Distributing has asked me to assume that there are at most minimal substantive differences between DuPont's Spies Hecker brand paints, and the BMW ColorSystem paints.[4]

14.     Subject to this assumption, I have been asked to evaluate whether BMW has market power in certifications; whether BMW's certification program is a restraint of trade; and whether that restraint is reasonable.

15.     In formulating my opinions, I have reviewed plaintiff's Complaint and the other materials cited in footnotes to this Report.

16.     I understand that a number of factual and/or legal issues remain to be decided by the Court.  In addition, I understand that fact discovery is at a relatively early stage, and is expected to continue beyond the expected submission date of this Report.  It is possible or likely that in the future other information will subsequently become available to me, including deposition testimony, the opinions of other experts, documents, data and/or other materials.  I reserve the

---

[2] Interview with Tony Nicolosi, 3/31/11; hereinafter, "Nicolosi Interview."
[3] Nicolosi Interview.
[4] This appears to be a reasonable assumption.  Testimony in this matter indicates that DuPont manufactures BMW's ColorSystem paints (Burton Depostion, pp. 19-20), and the ColorSystem paints are comparable to the Spies Hecker paints.  Burton Deposition, p. 234; see also Deposition of William Hawkins, February 23, 2011 (hereinafter, "Hawkins Deposition"), p. 38.  In addition, training, support and service for the ColorSystem is provided by a DuPont employee, Mr. Zacharias (Burton Deposition, pp. 40-41; Hawkins Deposition, pp. 38-40).  I also understand that DuPont distributors such as Nicolosi can obtain from DuPont a "cross-reference" for the color formula or recipe used in any BMW color (Nicolosi Interview).  However, neither Spies Hecker nor BMW ColorSystem may be able to match perfectly every possible color of BMW automobiles (Burton Deposition, p. 186), and some collision centers may prefer to use BMW's ColorSystem, even if it were not required for certification (Hawkins Deposition, p. 87).

right to modify my opinions as additional information becomes available, and to supplement this Report accordingly.

## IV.  SUMMARY OF OPINIONS

17.     BMW is clearly a monopolist in "BMW certification" of auto repair facilities, including collision centers or body shops, since no other entity may offer such certifications.

18.     "BMW certification" is important to many collision center customers who own BMWs,[5] and some BMW dealers with body shops feel compelled, as a business matter, to obtain this certification.[6]  To my knowledge, no acceptable substitute for this certification is available.

19.     Starting in 2010, BMW conditioned its certification of German Motors on a requirement that German Motors paint BMW cars with BMW's ColorSystem automotive paints, which are available exclusively from BMW.[7]

20.     In this case, German Motors had previously chosen to enter into an exclusive supply arrangement with Nicolosi,[8] and was satisfied with that relationship.[9]  But-for BMW's requirement to exclusively use its "Color System," German Motors would have maintained its exclusive purchase arrangement with Nicolosi.[10]

21.     The requirement of BMW's certification program that paint be exclusively purchased from BMW is therefore a restraint of trade.

22.     In addition, I understand that testimony in this matter will reveal that certain other body shops prefer not to purchase DuPont or other non-BMW branded paints, out of a concern of losing lucrative BMW body work.  Because body shops prefer "one-stop shopping," holding everything else equal they will tend to purchase paint and accessories (sanding materials, masks, etc.) from a single vendor.[11]  The effects of BMW's certification program will likely therefore not be limited to Nicolosi's sales of paint.

---

[5] Burton Deposition, pp. 78-79.  Hawkins Deposition, pp. 32-36, 84-85.
[6] Burton Deposition, p. 74.
[7] Burton Deposition, pp. 83-84, 102-03.
[8] Burton Deposition, pp. 40-41.
[9] Burton Deposition, pp. 50-53.
[10] Burton Deposition, p. 53.
[11] Nicolosi Interview, 3/31/11.

23.      In the past, prior to offering its own brand of paints, BMW provided certification when body shops used specified brands of paints available from third parties, including DuPont's Spies Hecker brand sold by Nicolosi.[12]   Given that there are minimal, at most, substantive differences between DuPont's Spies Hecker brand paints and the BMW ColorSystem paints, and based on the factual record to date, it appears that there is no reasonable basis for this restraint, because the same benefits could be obtained with less harm to competition.  For example, as it did in the past, it would appear feasible for BMW to specify the brands or types of DuPont paint which would be compliant with certification.  This would enable competition among providers of the compliant paint brands.


Respectfully Submitted,



Daniel E. Ingberman
April 1, 2011

---

[12] Hawkins Deposition, pp. 18-19, 63-64.  Burton Deposition, pp. 32, 61-62.

**CONFIDENTIAL**

Expert Report of Daniel E. Ingberman                                                                 8

Attachment A

**DANIEL E. INGBERMAN**
daniel@ingberman.com
**(510) 848-4615**

## DEGREES HELD

CARNEGIE-MELLON UNIVERSITY, Tepper School of Business, Pittsburgh, PA

*Ph.D.*, Economics, 1986
*M.S.*, Economics, 1983

Honors:       *-Alexander Henderson Award for Excellence in Economic
                   Theory*
               *-Sloan Foundation Doctoral Dissertation Fellowship*
               *-H. B. Earhardt Doctoral Fellowship*
               *-William Larimer Mellon Doctoral Fellowship*

DUKE UNIVERSITY, Durham, NC

*A.B.*,   Economics/History, 1981

Honors:       *-Magna cum Laude*
               *-Phi Beta Kappa*

## PROFESSIONAL EXPERIENCE

*Academic Appointments*

UNIVERSITY OF CALIFORNIA, BERKELEY
Walter A. Haas School of Business, Visiting Associate Professor, 2001 – 2005
Boalt School of Law, Lecturer, 2002 –

WASHINGTON UNIVERSITY, Olin School of Business
Adjunct Professor of Managerial Economics, 2011-
Associate Professor of Managerial Economics, 1995-1998
Visiting Associate Professor of Managerial Economics, 1993-1995

UNIVERSITY OF PENNSYLVANIA, The Wharton School of Business
Anheuser-Busch Assistant Professor of Public Policy & Management, 1986-1993
Anheuser-Busch Lecturer in Public Policy & Management, 1985-1986

CARNEGIE-MELLON UNIVERSITY, Tepper School of Business
Instructor, 1982-1984

*Consulting Affiliations*

COMPASS Lexecon
Senior Consultant, 2008 –

COMPETITION POLICY ASSOCIATES, INC. (COMPASS)
Senior Consultant, 2006 –  2008

LEXECON, INC.
Senior Consultant, 2006 –  2008

EAST-WEST ECONOMICS
Senior Consultant, 2006 –

CHICAGO PARTNERS, Inc.
Affiliate, 2006 – 2009

LECG
    Affiliate, 2007 – 2009
    Principal, 1999 – 2007
    Co-Director, Emeryville, California Office, 2000-2005
    Member, LECG Board of Governors, 2001-2005
    Senior Managing Economist, 1998-1999

THE RND GROUP
Principal, 2004 –  2009

## PUBLICATIONS

1) "Civil Conspiracy Claims and the Economics of Collusion," with Christopher Loos and Jonathan Tomlin. *Mass Torts*, Volume 7, Number 3, Summer 2009, pp. 8-11.

2) "Siting Noxious Facilities: Are Markets Efficient?" in Hilary Sigman, editor, <u>The Economics of Hazardous Waste and Contaminated Land,</u> Edward Elgar, 2008. Reprinted from *Journal of Environmental Economics and Management* 29 (1995): S-20 – S-33.

3) "Fly-By-Night or Face-the-Music? Premature Dissolution and the Desirability of Extended Liability," with James Boyd. *American Law and Economics Review* 5 (2003): 189-232.

4) "The Vertical Extension of Environmental Liability Through Chains of Ownership, Contract, and Supply," with James Boyd. In *The Law and Economics of the Environment*, edited by Anthony Heyes, 44-70. Cheltenham, UK: Edward Elgar, 2001.

5) "An Analysis of Settlement and Merit Under Federal Securities Law: What Will be the Effect of the Reform of 1995?" with James Holloway and Ronald King. *Journal of Accounting and Public Policy* 18 (1999): 1-30.

6) "Do Punitive Damages Promote Deterrence?" with James Boyd. *International Review of Law and Economics* 19 (1999): 47-68.

7) "The Search for Deep Pockets: Is 'Extended Liability' Expensive Liability?" with James Boyd. *Journal of Law, Economics, and Organization* 13 (1997): 232-258.

8) "Should 'Relative Safety' be a Test of Product Liability?" with James Boyd. *Journal of Legal Studies* 26 (1997): 433-473.

9) "An Experimental Investigation of Multi-defendant Bargaining in Joint and Several and Proportional Liability Regimes." with Nicholas Dopuch and Ronald R. King. *Journal of Accounting and Economics* 23 (1997): 189-221.

10) "The 'Polluter Pays Principle': Should Liability Be 'Extended' When the Polluter Cannot Pay?" with James Boyd. *The Geneva Papers on Risk and Insurance – Issues and Practice*, no. 79 (1996): 182-203.

Daniel E. Ingberman                                                           2011

11) "Market vs. Government: The Political Economy of NIMBY." with Gerald R. Faulhaber. In *The Political Economy of Environmental Protection: Analysis and Evidence,* Edited by Roger D. Congleton, 169-188. Ann Arbor: The University of Michigan Press, 1996.

12) "Siting Noxious Facilities: Are Markets Efficient?" *Journal of Environmental Economics and Management* 29 (1995): S-20 – S-33.  Reprinted in Hilary Sigman, editor, <u>The Economics Of Hazardous Waste And Contaminated Land,</u> Edward Elgar, 2008.

13) "Triggers and Priority: An Integrated Model of the Effects of Bankruptcy Law on Overinvestment and Underinvestment." *Washington University Law Quarterly* 72 (1994): 1341-1377.

14) "Non-Compensatory Damages and Potential Insolvency." with James Boyd. *Journal of Legal Studies* 23 (1994): 895-910.

15) "An Institutional Theory of Divided Government and Party Polarization." with John J. Villani. *American Journal of Political Science* 37 (1993): 429-471.

16) "Incumbent Reputations and Ideological Campaign Contributions in Spatial Competition." *Mathematical and Computer Modeling* 16 (1992): 147-169. (Reprinted in *Formal Theories of Politics II: Mathematical Modeling in Political Science*, edited by P.E. Johnson. Pergamon Press, 1992.)

17)  "Presidential Commitment and the Veto." with Dennis A. Yao. *American Journal of Political Science* 35 (1991): 357-389.

18)  "Circumventing Formal Structure through Commitment: Presidential Influence and Agenda Control." with Dennis A. Yao. *Public Choice* 70 (1991): 151-179.

19) "Reputational Dynamics in Spatial Competition." *Mathematical and Computer Modeling* 12 (1989): 479-496. (Reprinted in *Formal Theories of Politics: Mathematical Modeling in Political Science*, edited by P.E. Johnson. Pergamon Press, 1989.)

20)  "The Political Economy of Fiscal Policy." with Robert P. Inman. In *Surveys in Public Sector Economics*, edited by Paul G. Hare, 105-160. Basil-Blackwell, 1988.

21) "Reputation, Commitment, and the Dynamics of Effective Legislative Leadership." *Public Choice* 55 (1987): 121-126.

22) "Privatization: Your Rents or Mine?" *Journal of Policy Analysis and Management* 6 (1987): 607-611.

23)  "Candidate Reputations and the 'Incumbency Effect.'" with M. Daniel Bernhardt. *Journal of Public Economics* 27 (1985): 47-67.

24) "Running Against the Status Quo: Institutions for Direct Democracy Referenda and Allocations Over Time." *Public Choice* 46 (1985): 19-43.


## SCHOLARLY AND ACADEMIC ACTIVITIES: Summary

-More than 75 invited presentations at major universities and conferences.
-Broad teaching experience, including undergraduate, MBA, executive MBA, Ph.D. and thesis supervision.
-Teaching awards/commendations at Haas, Olin and Wharton.
-Chair of committees (including responsibility for curriculum development).
-Organized conferences and faculty seminar series.
-Received more than ten faculty grants and fellowships.


## SCHOLARLY PRESENTATIONS

American Law and Economics Association Meetings; American Political Science Association Meetings; California Institute of Technology; Carnegie-Mellon University; Carnegie Conference in Political Economy; Charles River Associates; Columbia University; Conference on Privatization of the Public Sector (University of Pennsylvania); Conference on Political Behavior and Institutions (Stanford); European Association of Law and Economics; George Mason University; Georgetown University; Hoover Institution; Information in Politics (Texas); LECG; Lehigh University; Northwestern University; Olin Conference on Law, Economics and Politics of the Environment; Olin School Annual Conference on Financial Economics and Accounting; Princeton University; Public Choice Society; Resources for the Future; Social Science History Association Meetings; Southern Economics Association Meetings; Southern Political Science Association Meetings; Stanford University; Texas A&M University; UCLA; UCSD; United States Department of Justice; University of Delaware; University of Minnesota; University of Rochester; University of Pennsylvania; University of Southern California; Villanova University; Washington University in St. Louis; Washington University Conference on Bankruptcy; Western Economic Association Meetings.


## EDITORIAL ACTIVITIES

Referee Reports for: American Economic Review, American Journal of Political Science, American Political Science Review, Econometrica, Economics and Politics, Formal Theories of Political Science, Games and Economic Behavior, International Review of Law and Economics, Journal of Development Economics,

Journal of Law and Economics, Journal of Law Economics and Organization, Journal of Policy Analysis and Management, Journal of Public Economics, Public Choice, Quarterly Journal of Economics, Review of Economic Studies.

## ACADEMIC ACTIVITIES

### A. Teaching Awards

Dean's Commendation, Haas School, 2004.

Reid Award for Undergraduate Teaching at Olin, 1995.

Wharton Undergraduate Teaching Award, 1990-1991.

Nominated for Anvil Award, Wharton MBA Teaching Award, 1990.

Nominated for Lindback Award, University of Pennsylvania Teaching Award, 1988.

### B. Courses Taught

1) Undergraduate courses

"Law & Economics I (Private Law)" (LS 145: 2002, 2004, 2005, 2006).

"Law & Economics II (Public Law)" (LS 147: 2008, 2010).

"Business Strategy in the Legal Environment" (MECO 390: 1995-1996).

"Business and Public Policy" (MGT 382: 1994-1996).

"Business in the Political Environment" (PPM 203: 1990-1991).

"Economic Policy Analysis" (ECON 30: 1987-1989).

"The Political Economy of Government" (PPM 201: 1986-1989, 1991).

"Political Analysis" (PPM 05: 1992).

"Principles of Economics" (ECON 001: 1985-1986).

2) Graduate courses

"Economic Analysis for Business Decisions 2" (Macroeconomics; EWMBA201B: 2005).

"Economic Analysis for Business Decisions 1" (Microeconomics and Competitive Strategy; EWMBA201A: 2001, 2002, 2003).

"Independent Study in Competitive and Corporate Strategy" (E293: 2002).

"Independent Study in Econometrics and Empirical Methods" (E293: 2003).

"Competitive and Corporate Strategy" (E210: 2001).

"Business in a Changing Environment" (MGT 5040: 1994-1995).

"Business-Government Relations" (MGT 741/PPM 780: 1992, 1993).

"Governmental and Legal Environment of Business" (LST 621: 1992).

"Managerial Economics" (MGEC 601: 1989-1990; EMBA 790: 1993-1994; MECO 5402 [macro], 5403 [micro]: 1996-1997).

"PhD Research Methods Seminar" (PPM 900: 1987-1990).

"Political Analysis" (PPM 781, 981: 1992).

"The Political Economy of Government" (PPM 770: 1991-1993).

"Social Choice and Social Justice" (PPM 911: 1986-1987, 1990, 1992).

## C. Academic Committees

Chairman, BSBA Committee (undergraduate curriculum committee), Olin School, 1995-1996.

Member, MBA and PMBA committees (full- and part-time MBA curriculum committees), Olin School, 1995-1996.

Chairman, Subcommittee on Revising Business Curriculum, Undergraduate Curriculum Committee, The Wharton School, Fall 1988 - Spring 1990.

Member, Undergraduate Executive Committee, The Wharton School, Fall 1989-1993.

Member, Undergraduate Curriculum Committee, The Wharton School, Fall 1986-1990, 1991-1992.

Dean's Representative, CAS Committee on Individualized Study, University of Pennsylvania, Fall 1987 - Spring 1989.

Dean's Representative, Committee on Undergraduate Admissions and Financial Aid, University of Pennsylvania, Fall 1987 - Spring 1989.

## D. Dissertation Committees

Daniel E. Ingberman                                                                                          2011

"Liability and Insolvency: An Equilibrium Analysis." (James Boyd; Howard Kunreuther, chair; 1992).

"Workers' Compensation vs. First Party Insurance for Occupational Disability." (Dong-Han Chang; Patricia Danzon, chair; 1991).

"Liability Laws and Environmental Policy: The Logic of Joint and Several Liability." (M.V. Rajeev Gowda; Howard Kunreuther, chair; 1991)."Essays on Maximum Demand in Electricity." (Seong-Uh Lee; Paul Kleindorfer, chair; 1990).

"Essays on the Political Economy of Resource Allocation Through Democratic Processes." (Miftah Ahmad; Robert Inman, chair; 1990).

"Three Essays on the Role of Institutional Arrangements in International Economic Organizations' Policy Making." (Bernard Gauthier; Daniel Ingberman, chair; 1989).

"Competitive Processes of Collective Decision Making Under Simple Majority Rule." (Joon-Han Kim; James Laing, chair; 1987).

## E. Conferences and Seminars Organized

Seminar organizer, Public Policy and Management Brown-Bag Seminar Series, University of Pennsylvania, 1991-1992.

Seminar organizer, Political Economy Workshop (joint Economics/Public Policy and Management), University of Pennsylvania, 1990.

Co-convener, PARSS Faculty Seminar: "Environmental Risk and Public Policy," The Wharton School, 1988-1993.

Founding member (with R. Hartwell, R. Inman, H. Root), PARSS (Mellon) Faculty Seminar: "Historical Data and Theories of Rational Choice," University of Pennsylvania, 1985-1989.

Conference organizer, "Environmental Risk and Real Estate Development," The Wharton School, December 1988.

Conference organizer (with S. Wachter), "Public Policy and Affordable Housing," The Wharton School, February 1990.

## F. Grants, Honors, & Awards

University Research Foundation Grant University of Pennsylvania, 1987, 1991.

Junior Faculty Summer Research Fellowship The Wharton School, 1986, 1987, 1988, 1989.

PARSS Faculty Research Fellowship University of Pennsylvania, 1986.

MOIS Courseware Development Grant University of Pennsylvania, 1986, 1987.

Alexander Henderson Award for Excellence in Economic Theory Carnegie-Mellon University, 1985.

Alfred P. Sloan Doctoral Dissertation Fellowship in Economics. The Sloan Foundation, 1984-1985.

H. B. Earhardt Doctoral Fellowship Carnegie-Mellon University, 1982-1983.

William Larimer Mellon Ph.D. Fellowship Carnegie-Mellon University, 1981-1984.

*Phi Beta Kappa* 1981.

Daniel E. Ingberman                                                              2011

## Expert Disclosures 2000-2010

**American Traffic Solutions, Inc. v. Redflex Traffic Systems, et. al.** (Alleged violations of the Lanham Act.) Before the United States District Court for the District of Arizona, Case No. 2: 08-CV-02051-PHX-FJM. Retained by plaintiff American Traffic Solutions. Expert Report, July 15, 2009. Rebuttal Report, October 7, 2009. Deposition, January 7, 2010.

**Glasforms, Inc. and Dong Ah Rubber and Tire CO., LTD v. CTG International.** (Damages resulting from alleged breach of contract, breach of implied warranty of fitness for a particular purpose, and breach of implied warranty or merchantability.) Before the United States District Court, Northern District of California, San Jose Division, Case No. C 06-03359 JF. Retained by plaintiff/defendant/third party plaintiff, Glasforms Inc. Expert Report, September 8, 2008. Deposition, April 22, 2009. Testified in trial, September 8, 2009.

**Memry Corporation and Schlumberger Technology Corporation v. Kentucky Oil Technology, et al.** (Damages resulting from alleged misappropriation of trade secrets.) Before the United States District Court, Northern District of California, San Jose Division, Case No. CV 04-03843 RMW (HRL). Retained by defendant/counterclaimant, Kentucky Oil. Expert Report, January 19, 2007. Testified in deposition, March 8, 2007. Testified in trial, December 11, 2007.

**In re Dynamic Random Access Memory (DRAM) Antitrust Litigation.** (Alleged price fixing.) Before the United States District Court, Northern District of California, San Francisco Division, MDL #1486, Master File No. M-02-1486-PJH. Retained by defendant, Samsung. Expert Declaration, October 15, 2007.

**MAX Software, Inc. v. Computer Associates, Inc.** (Damages resulting from alleged misappropriation and other intellectual property claims.) Before the American Arbitration Association, Case No. 13117 Y 02365 05. Retained by claimant, MAX Software. Expert Report, February 12, 2007. Supplemental Report, March 8, 2007. Rebuttal Report, March 27, 2007.

**Collaboration Properties, Inc. v. Tandberg ASA and Tandberg, Inc.** (Damages resulting from alleged patent infringement.) Before the United States District Court, Northern District of California, San Francisco Division, Case No. C 05 01940. Retained by plaintiff, Collaboration Properties. Expert Report, January 26, 2007.

**Gens v. Ferrell.** (Damages resulting from alleged breach of contract and misappropriation of trade secrets.) Before the Superior Court of the State of California, County of San Mateo, Case No. CIV 439400. Retained by plaintiff/counterdefendant, Gens. Testified in deposition, March 6, 2006.

**In re Linens Antitrust Litigation.** (Damages resulting from alleged violations of the Sherman Act.) United States District Court, Southern District of New York, Case No. 03 Civ. 7823. Retained by defendant, Best Metropolitan. Expert Report,

Daniel E. Ingberman                                                          2011

January 13, 2006.

**UTStarcom v. Starent Networks Corp.** (Intellectual property damages and analysis of alleged irreparable marketplace injury.)  Before the United States District Court, Northern District of California, San Jose Division, Case No. C 04 01122 PVT (ADR).  Retained by plaintiff/counterdefendant, UTStarcom, Inc. Expert Declaration, February 15, 2005.  Testified in deposition, March 24, 2005.

**AT&T Corporation v. Sprint Corporation, et. al.** (Alleged trademark infringement damages under the Lanham Act.)  Before the United States District Court, Southern District of New York, Case No. 03 Civ. 2118 (DLC).  Retained by claimant, AT&T Corp.

**Accela, Inc. v. Atlantic Management Center, Inc.** (Damages resulting from alleged breach of contract.)  Before the American Arbitration Association, Case No. 74 117 01119 03 TNC.  Retained by claimant, Accela, Inc.  Expert Report, June 9, 2004.

**Gracenote, Inc. v. MusicMatch, Inc.** (Alleged patent misuse; antitrust analysis.) Before the United States District Court, Northern District of California, Oakland Division, Case No. C 03-3162 CW.  Retained by plaintiff /counterdefendant, Gracenote, Inc.  Expert Report, March 12, 2004.  Testified in deposition, July 29, 2004.

**William D. Hoffman, on behalf of the General Public of the State of California v. American Express Travel Related Services Co., and Does 1-50.** (Damages analysis.)  Before the Superior Court of the State of California for the County of Alameda, Case No. 2001-022881.  Retained by plaintiff class.  Expert Declaration, January 19, 2004.

**GTD Enterprises v. The Board of Trustees of the Leland Stanford Junior University and Stuart Moldaw** (Analysis of alleged violations of California Business and Professions Codes § 17200, § 17045 and § 17048, and antitrust claims.)  Before the Superior Court of the State of California, County of Santa Clara, Case No. CV 786012.  Retained by the defendants, Stanford University, et. al.  Expert Declaration, June 25, 2003.  Expert Report, August 6, 2003.

**In Re Cleveland Bar Association v. CompManagement, Inc., et al.** (Economic impact analysis.)  Before the Board of Commissioners on the Unauthorized Practice of Law of the Supreme Court of Ohio.  Retained by respondent, CompManagement, Inc.  Expert Report, April 21, 2003.  Testified May 22, 2003.

**Computer Motion, Inc. v. Intuitive Surgical, Inc.** (Alleged patent infringement damages.)  Before the United States District Court, Central District of California, Western Division, Case No. CV 00-4988 CBM (RCx).  Retained by plaintiff, Computer Motion, Inc.  Expert Report, January 27, 2003.

**Tickets.com, Inc. v. Oakland Coliseum Joint Venture, LLC/SMG.** (Analysis of alleged breach of contract.)  Before the American Arbitration Association, Case No. 72 181 01083 02 SACO.  Retained by claimant/counterrespondent, Tickets.com.

Expert Report, November 1, 2002.  Testified in deposition, November 27, 2002.
Testified January 13, 2003.

**Linda Schilcher v. Board of Trustees of the University of Arkansas, et al.**
(Damages resulting from alleged wrongful termination and employment
discrimination.)  Before the United States District Court, Western District of
Arkansas, Fort Smith Division, Case No. 00-5213.  Retained by defendant,
University of Arkansas. Expert Report, May 15, 2002.  Testified in deposition, May
30, 2002.

**Osmonics, Inc., and Poretics Corporation v. James Humphrey, et al.** (Analysis
of alleged breach of contract and unfair competition.)  Before the Superior Court of
the State of California in and for the County of Alameda, Eastern Division, Case
No. V-013547-0.  Retained by plaintiffs Osmonics and Poretics.

**People of the State of California v. ALVA-AMCO Pharmacal Cos. Inc., et al.**
(Statistical and damages analysis.)  Before the Superior Court of the State of
California for the County of San Francisco.  Retained by defendant, Johnson &
Johnson.

**Quintero-Smith, Inc. v. Herman Miller, Inc. and Herman Miller, Inc., Miller
SQA, Inc.** (Intellectual property damages.)  Before the United States District Court,
Central District of California, Case No. 00-2745 TJH.  Retained by plaintiff,
Quintero-Smith, Inc.

**Sargon Enterprises, Inc. v. University of Southern California, et al.** (Damages
due to alleged breach of contract and fiduciary duty, antitrust claims, and violations
of California Business and Professions Code § 17200.)  Before the Superior Court
of the State of California for the City of Los Angeles, Central District, Case No.
BC209992.  Retained by defendant/counterclaimant, University of Southern
California.

**Michael and Sandy Krummes v. Papa Murphy's International, Inc.** (Damages
due to alleged breach of contract and breach of fiduciary duty.)  Retained by
defendant, Papa Murphy's International, Inc.  Expert Report, January 25, 2001.

**R.J. Reynolds Tobacco Company and GMB, Inc., v. Premium Tobacco Stores,
Inc., et al.** (Analysis of alleged antitrust violations and unfair trade practices.)
Before the United States District Court for the Northern District of Illinois, Eastern
Division, Case No. 99 C 1174.  Retained by plaintiff/counterdefendant, R.J.
Reynolds Tobacco Company.

**Larsen Electric Sign Company, Inc. v. A. Kent Greene, et al.** (Damages due to
alleged breach of contract and breach of fiduciary duty.)  Before the District Court
of Clark County Nevada, Case No. A368306.  Retained by defendant, A. Kent
Greene.  Testified in deposition, September 15, 2000.

**Kay T. Nunnally, et al. v. R.J. Reynolds Tobacco Company and Basic Foods,
Inc.** (Analysis of punitive damages.)  Before the Circuit Court of Desoto County
Mississippi.  Retained by defendant, R.J. Reynolds Tobacco Company.

Daniel E. Ingberman                                                                    2011

**Microchip Technology, Inc. v. Scenix Semiconductor, Inc., and Parallax, Inc., And Related Counterclaims** (Antitrust analysis of alleged patent misuse and invalidity claims.) Before the United States District Court, Northern District of California, San Francisco Division, Case No. C97-03923 WHO. Retained by defendant/counterclaimant, Scenix Semiconductor, Inc. Expert Declarations, June 22, 2000 and August 17, 2000.

**Louis H. Erichs, et al. v. Venator Group, Inc.** (Statistical analysis; employment compensation/commission.) Before the United States District Court for the Northern District of California, Case No. C 98-2981 SBA. Retained by Defendant, Venator Group, Inc. Expert Declaration, March 10, 2000.

# EXHIBIT B

23. BMW acted intentionally in that it knew that requiring German Motors to use BMW paint on any BMW car painted by German Motors would require German Motors to violate its exclusive supply agreement with NDI [Exhibit A hereto], and would further cause German Motors to cease purchasing non paint products from NDI.

24. BMW acted with the specific intent to induce German Motors to breach its exclusive supply agreement with NDI and to cease purchasing non paint products.

25. BMW's conduct was wanton, oppressive and malicious, and warrants the imposition of punitive damages pursuant to Civil Code Section 3294, in an amount according to proof.

26. BMW's intentional interference with contract and inducement of breach of contract proximately caused plaintiff NDI damages in an amount in excess of $75,000, in terms of lost profits on sales on non -paint products that NDI would have had but for the conduct of BMW, plus pre judgment interest in an amount according to proof, plus punitive damages per Civil Code Section 3294 in an amount according to proof.

WHEREFORE plaintiff prays for damages as set forth below.

## V.
### THIRD CLAIM FOR RELIEF FOR VIOLATION OF CALIFORNIA'S ANTI COMPETITION ACT, BUSINESS AND PROFESSIONS CODE SECTION 17200

27. This is a third claim for relief by plaintiff Nicolosi Distributing, Inc. ["NDI"] against BMW of North America, LLC. ["BMW"] for violation of California's Anti Competition Act, Business and Professions Code Section 17200. The amended complaint's claims regarding a violation of Business and Professions Code section 16727 [illegal tying arrangements] and 16726 [illegal

restraints of trade] [Fourth claim for Relief herein] are incorporated into this claims for relief.

28. NDI is a distributor of automotive paints used by auto body shops to paint cars. NDI sells a group of automotive paints and paint products produced by Du Pont, including a brand called Spies Hecker. NDI also sells other non paint products such sandpaper, tape, masking paper, and related auto body repair products.

29. During May 2, 2005 NDI entered into an exclusive paint supply agreement with German Motors. A copy of that agreement is attached hereto as Exhibit A. Page 2, Para. 2 of the agreement provides:

> "All paint materials, DPC products, and supplies will be purchased **exclusively** through
>
> NICOLOSI DISTRIBUTING INC.  Materials purchased by BMW OF SAN FRANCISCO
>
> will not be bought through any other vendors."

30. Other non paint products sold by NDI that are not part of the agreement [Exhibit A] generate a prospective economic advantage, as it is typical and probable that the distributor that sells a body shop its paint will also sell the same body shop with non paint supplies, such as sandpaper, masking tape, masking paper, and other non paint products. NDI had a prospective economic advantage in the sales and profit earning of such non paint products to German Motors.

31. BMW had actual knowledge of the existence of this contract and  prospective economic advantage, as management of German Motors told BMW about it, and specifically explained that it had a  multi year contract to purchase paint from only NDI and no one else, and that NDI was also selling non paint products to German Motors as well.

32. BMW intentionally interfered with NDI's contract and prospective economic advantage with German Motors, and actually did interfere with that prospective economic advantage by the following conduct:

33. BMW has decided to produce its own paint line, which it calls BMW paint, or other similar name. BMW requires auto body shops painting a BMW automobile to only use BMW paint. BMW forced German Motors to enter into a written agreement, a Copy of which is attached hereto as Exhibit B, which requires German Motors to use BMW paint on any BMW car painted by German Motors. A copy of the executed contract between German Motors and BMW of North America is attached hereto as Exhibit C.

34. BMW acted intentionally in that it knew that requiring German Motors to use BMW paint on any BMW car painted by German Motors would require German Motors to violate its exclusive supply agreement with NDI [Exhibit A hereto], and would further cause German Motors to cease purchasing non paint products from NDI.

35. BMW acted with the specific intent to induce German Motors to breach its exclusive supply agreement with NDI and to cease purchasing non paint products.

36. BMW's conduct was wanton, oppressive and malicious, and constitutes an illegal tying agreement, in violation of California Business and Professions Code Section 16727, which provides:

"It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefore, or discount from, or rebate upon, such price, on the condition,

agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

37. BMW's conduct further constitutes an illegal restraint of trade, in violation of California Business and Professions Code section 16726.

38. BMW's conduct constitutes a violation of Business and Professions Code Section 17200, based on the above allegations of wanton, oppressive, malicious and illegal conduct.

39. BMW's violation of Business and Professions Code 17200 proximately caused plaintiff NDI actual damages in an amount in excess of $75,000, in terms of lost profits on sales on non paint products that NDI would have had but for the conduct of BMW, plus pre judgment interest in an amount according to proof, plus punitive damages per Civil Code Section 3294 in an amount according to proof. These damages are alleged herein to show that NDI has standing to sue. NDI does not seek these damages in this claim, but instead seeks them in the above two alleged claims for relief.

40. NDI seeks all available equitable remedies in this matter, including:

41. Injunctive relief requiring BMW to stop its program of requiring body shops to use only BMW paint when painting BMW automobiles, or requiring body shops to use BMW paint when BMW knows that in doing so the body shop is breaching an exclusive supply agreement with another

paint supplier, or such other injunctive relief as the Court deems just and appropriate.

42. BMW should be ordered to disgorge any profits or other economic benefit, or give plaintiff restitution, in an amount according to proof but equal the amount of profits or other economic benefits BMW has received by way of instituting this program of requiring auto body shops to purchase only BMW paints to paint BMW automobiles, or requiring auto body shops to use BMW paint when BMW knows that in doing so the body shop is breaching an exclusive supply agreement with another paint supplier, or such other disgorgement or restitution relief as the Court deems just and appropriate.

43. For attorneys fees under the common fund rule of recovering attorneys fees. Plaintiff will create a common fund and remedy in this matter that will impact and benefit many other distributors like itself, and is entitled to attorneys fees in an amount according to proof.

44. For any other equitable or other relief available under the circumstances under Business and Professions Code Section 17200.

**VI.**
**FOURTH CLAIM FOR RELIEF FOR VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 16727 AND ILLEGAL RESTRAINT IN TRADE IN VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 16726.**

45. This is a Fourth Cause of Action by Nicolosi Distributing, Inc. ["NDI"] against BMW of North America, LLC. ["BMW"] for violation of Business and Professions Code Sect. 16727, and an illegal restraint of trade, in violation of Business and Professions Code section 16726.

46. Business and Professions Code section 16727 provides:

"It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefore, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

47. Business and Professions Code section 16726 states:

"Except as provided in this chapter, every trust is unlawful, against public policy and void."

48. The allegations of the Third Cause of Action are incorporated herein.

49. Attached hereto as exhibit C is a true and correct copy of the agreement entered into between German Motors Corp. and BMW of North America. The particulars of the illegal tying arrangement are: BMW of North America has a certification program whereby it certifies an automobile body shop and/or refinisher [car painter] as a "certified collision repair center" [CCRC].

50. This certification/designation is the tying product. The tied product is BMW-branded automotive paints.

51. As an alternative form of relief, the CCRC arrangement is a further restated herein as an illegal restraint of trade, as further described below.

52. These paints bear the BMW name as a brand, but are actually manufactured by DuPont, under a contractual arrangement between BMW of North America and DuPont. Plaintiff does not have a copy of the operating agreement between BMW and DuPont, and has requested a copy through discovery. BMW of North America has substantial economic power in the tying process [certification of collision repair centers], in that it is the only entity that has the authority to give such certification. Such certification has such critically important economic consequences that it would not be an option for the BMW auto body dealership to not be certified. Without the certification, the body shop loses the marketing allure of certified status. The marketing allure is seen as a mandate by collision centers that focus on BMW vehicles, to the point that they are actually forced and coerced into purchasing BMW-branded paints.

53. This tying arrangement constitutes a violation of B&P Code section 16727.

54. The CCRC arrangement further constitutes an unlawful restraint of trade in violation of Business and Professions Code section 16726 in that it restrains the ability of sellers such as Nicolosi Distributing, Inc. to offer and sell DuPont-branded paint supplies to BMW dealerships. Nicolosi Distributing, Inc. has been informed by several BMW dealership collision centers that they simply cannot purchase paint supplies for BMW refinishing [auto painting] from Nicolosi Distributing, Inc. no matter how attractive the price, the quality of the product, or any other similar marketing, quality, or service issues. The following BMW dealership body shops have so informed Plaintiff: San Francisco, Oakland, and Concord.

55. In creating and maintaining this unlawful restraint on trade, BMW has exploited its market power as the only entity that give its collision centers certified status. As stated above, this certified status is of critical importance to BMW auto collision centers. In undertaking this certification process, BMW of North America and the CCRCs agreed to this anti-competitive conduct of buying only BMW-branded paint in order to become certified CCRCs.

56. Although BMW of North America has stated that a body shop's participation in the CCRC program is voluntary the practical consequence of not being certified are so dire that two BMW dealerships' [German Motors Corp. dba BMW of San Francisco and Weatherford BMW in Berkeley, CA] body shop managers have both sworn in deposition testimony that not being certified as a CCRC was not an option. According to the body shop manager of Weatherford BMW [William Hawkins], the typical BMW automobile owner is a sophisticated, well-informed consumer and knows how to access information such as whether a body shop is certified or not, and will typically NOT choose to deal with a shop that is not certified. These cars are fairly expensive [often in the $60,000-$70,000 range], and that the BMW consumer is brand-conscious and needs the assurance of BMW's certification of the body shop. Mr. Hawkins also confirmed that the fact that other Bay Area body shops are certified [such as BMW of San Francisco and Concord BMW], creates a further market-based need to be certified. A BMW owner will easily drive to either of the San Francisco, Berkeley, or Concord locations to have their cars painted. So long as the other local dealers remain certified, it is not a practical option for a BMW dealer's body shop not to be certified.

57. This restraint on trade is unreasonable because the BMW-branded paint is made by DuPont Corp., and is basically the same as the paint NDI previously sold to German Motors Corp. [i.e. Spies-Hecker paint, which is manufactured by DuPont's wholly-owned subsidiary in Germany].

BMW does not have any facts or evidence that BMW paint is substantively different or better than Spies-Hecker branded paint. BMW of North America's actual motivation in imposing the restraint of trade is to force dealers to buy the paint from BMW, and thereby make a profit from the sales. There are no quality of service, quality of product, or other quality justifications for the imposition of this restraint of trade. BMW is forcing auto body shops connected to BMW dealerships to purchase BMW branded paints, by requiring such purchases as a condition to obtain CCRC status. As noted above, this status has a marketing allure that renders not having that status as not an option.

58. The purpose of effect of defendant conduct was to restrain competition. Specifically, BMW seeks to stifle and eliminate competition between its BMW-branded paint line, and other paint lines such as DuPont Spies-Hecker paint line sold be NDI. The restraint of trade does this by the attached CCRC agreement [Ex. C, page 1, para. 1]:

> "Center agrees to purchase and use ColorSystem products for all repair and refinish work performed on BMW Group vehicles at its locations not later than six months from the date of this agreement. This six-month period is designed to allow training to use the ColorSystem paint equipment."

59. The anti-competitive effect of the restraint outweighs any beneficial effect that restraint has on competition. It is unreasonable because the BMW-branded paint is made by DuPont, and is basically the same as the paint NDI previously sold to German Motors Corp. [i.e. Spies-Hecker paint, which is manufactured in Germany]. BMW has even appointed a DuPont employee [Franz Zacharias] as the head of BMW's ColorSystem training program. BMW does not have any facts or evidence that BMW paint is substantively different or better than Spies-Hecker branded paint. BMW of North America's actual motivation in imposing the restraint of trade is to force dealers to

buy the paint from BMW, and thereby make a profit from the sales. There are no quality of service, quality of product, or other quality justifications for the imposition of this restraint of trade. BMW is forcing auto body shops connected to BMW dealerships to purchase BMW-branded paints, by requiring such purchases as a condition to obtain CCRC status. As noted above, this status has a marketing allure that renders not having that status as not an option.

60. The CCRC program is part and parcel to the overall franchise agreements existing between BMW North America and the BMW dealerships such as German Motors dba BMW of SF, Weatherford BMW, Berkeley, and BMW Concord. As part and parcel to that franchise agreement, there is the following purchase involved in the tying product [CCRC designation]: the BMW dealers are required to pay over various royalty fees, lease amounts, franchise fees, and other revenue sharing. Thus, the CCRC program involves fees being paid for the CCRC program based on existing franchise agreements between BMW dealers and BMW North America.

61. As to the tied product [BMW paint], the paint is purchased by the BMW dealers' body shops. These body shops are generally directly connected into the corporate umbrella of the dealer [as is the case with German Motors Corp, Weatherford BMW in Berkeley, and Concord BMW].

62. The CCRC program is permitting BMW of North America to exploit its economic power in the tying product [CCRC designation], to achieve substantial monopoly power in the tied product [BMW paint].

63. The impact of the CCRC program may vary regionally throughout the United States. In the San Francisco Bay Area region, which is the region at issue in this action, German Motors, Weatherford, and Concord BMW all participate in the CCRC program. The fact that other distant

regions may not participate in the CCRC program is irrelevant to a BMW owner in the Bay Area. For example, a BMW owner in San Francisco will have a choice to have his or her car painted in BMW of San Francisco, or at Weatherford BMW in Berkeley, or at Concord BMW. That person is not going to drive to the Midwest to have the car painted.

64. BMW has asserted that there is a business justification in terms of quality control. This business justification has two major holes: first, the fact that the paint is manufactured by DuPont; that DuPont has appointed one of its employees [Franz Zacharias] as the trainer of the BMW dealerships' body shops; the fact that whenever there is a quality control issue, the dealers call DuPont and not BMW to fix it. This is the same scenario that existed before the current CCRC program: DuPont made the paint; DuPont has a training center where it trains body shop personnel to use its paint; DuPont people will come and fix any technical issues or respond to any warranty claims, including paying for those claims. The only real difference is that under the CCRC program, BMW North America gets to profit from selling the paint. It has basically made itself a kid of distributor of paint products, and has developed a method to force its dealers to buy its paint through the CCRC program.

65. There is a letter restrictive alternative, which BMW used to do, and which was working without a problem: the CCRC could go forward as is, except that CCRC designated shops could be allowed to purchase DuPont paint [such as Spies-Hecker, offered by Nicolosi] or BMW paint. It may very well be that some shops would opt for the BMW paint, while others would opt for the Spies-Hecker paint. As it stands right now, the CCRC program impermissibly restrains trade in the automotive business, by forcing BMW dealers' body shops to forego purchases of other paint lines, and requires them to only purchase BMW paint.

66. Any need by BMW North America to monitor paint sales, paint usage, number of cars painted, or any other car-refinishing data would involve the same process of analyzing invoices, paint purchase levels, and auto-refinishing projects completion data, no matter paint is being used.

67. Such conduct violates B&P Code section 16726 [restraints of trade] and 16727 [tying arrangements].

68. As a direct a proximate result of this tying arrangement and illegal restraint on trade, NDI has been damaged in fact, because it is unable to offer to sell and sell its DuPont-branded line of automotive paint to BMW certified collision repair centers in the San Francisco bay area.

69. BMW's violation of Business and Professions Code 16727 and/or section 16726 proximately caused plaintiff Nicolosi Distributing, Inc. actual damages in an amount in excess of $75,000, in terms of lost profits on sales on non paint products that Nicolosi Distributing, Inc. would have had but for the conduct of BMW, plus pre judgment interest in an amount according to proof, plus punitive damages per Civil Code Section 3294 in an amount according to proof.

70. Nicolosi Distributing, Inc. seeks all available equitable remedies in this matter, pursuant to B&P Code section 16750(a) including: An injunction enjoining defendants BMW from requiring body shops and/or automotive paint refinishers to use BMW paint when repainting BMW cars; or such other injunctive relief as the Court deems just and appropriate.

71. BMW should be ordered pursuant to B&P Code section 16750(a) to disgorge any profits or other economic benefit, or give plaintiff restitution, in an amount according to proof but equal the amount of profits or other economic benefits BMW has received by way of instituting this

program of requiring auto body shops to purchase only BMW paints to paint BMW automobiles, or requiring auto body shops to use BMW paint when BMW knows that in doing so the body shop is breaching an exclusive supply agreement with another paint supplier, or such other disgorgement or restitution relief as the Court deems just and appropriate.

72. For attorneys fees according to proof pursuant to Business and Professions Code Section 16727 and pursuant to B&P Code Sec. 16750(a).

73. Plaintiff requests a trebling of damages in an amount according to proof and pursuant to Business and Professions Code Sections 16726 and 16727 and pursuant to Business and Professions Code Section 16750(a).

WHEREFORE plaintiff prays for damages as set forth below.

1. For compensatory damages in excess of $75,000 on the first and second claim for relief.

2. For exemplary damages according to proof pursuant to California Civil Code Section 3294 or Federal Court exemplary damages.

3. For injunctive relief as requested in the third and fourth claims for relief.

4. For profit disgorgement, or restitution, in an amount according to proof, as requested in the third and fourth claims for relief.

# PROOF OF SERVICE

I, Elizabeth Vogel, declare as follows: That I am an adult over the age of 18, and have an office in Sacramento, California and am not a party to the present action.  On the date signed below, I served by mailing by first-class mail, postage pre-paid the following documents:

    1.   Disclosure of Expert Witnesses

The above listed documents were served on all parties herein by first-class mail to the following addresses:

Stephen Bledsoe
Berkowitz Oliver et al.
2600 Grand Blvd., Suite 1200
Kansas City, MO 64108
Tel: 816-561-7007
Fax: 816-561-1888

Eric Kizirian
Lewis Brisbois Bisgaard & Smith
221 N. Figueroa Street, Suite 1200
Los Angeles, CA 90012
Tel: 213-250-1800
Fax: 213-250-7900

I declare under oath and under penalty of perjury that the forgoing is true and correct and that this declaration was executed on April __|__, 2011 in Sacramento, California.

Elizabeth Vogel