1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   NICOLOSI DISTRIBUTING, INC.,                    No. C 10-03256 SI

9            Plaintiff,                             **ORDER DENYING DEFENDANT'S**
                                                    **MOTION FOR JUDGMENT ON THE**
10     v.                                           **PLEADINGS**

11  BMW OF NORTH AMERICA,

12            Defendant.
    _____/

13

14          Defendant BMW of North America's motion for judgment on the pleadings is currently

15  scheduled for hearing on April 22, 2011.  Pursuant to Civil Local Rule 7-1(b), the Court finds this matter

16  appropriate for resolution without oral argument and hereby VACATES the hearing.  Having considered

17  the papers submitted, and for good cause shown, the Court hereby DENIES defendant's motion.

18

19                                **BACKGROUND**

20          Plaintiff Nicolosi Distributing, Inc. is a distributor of automotive paints used by auto body shops

21  to paint cars.  Am. Compl. ¶ 6 ("FAC") (Doc. 35).  NDI sells a group of automotive paints and paint

22  products produced by Du Pont, including a brand called Spies Hecker.  *Id.*  In May 2005, plaintiff

23  entered into an exclusive multi-year paint supply agreement with German Motors.  *Id.* ¶¶ 7–8.  Plaintiff

24  also sells sandpaper, tape, masking paper, and related auto body repair products.  *Id.* ¶ 17.

25          Defendant BMW of North America has a certification program whereby it certifies an

26  automobile body shop and/or refinisher as a "certified collision repair center" or CCRC.  *Id.* ¶ 49.

27  German Motors, which does business as BMW of San Francisco, is a CCRC.  *Id.* ¶ 56.  Defendant also

28  produces its own line of paint.  *Id.* ¶ 10.

United States District Court
For the Northern District of California

Plaintiff alleges that defendant requires auto body shops painting a BMW automobile to only use BMW paint. *Id.* In furtherance of this policy, and intending for its actions to interfere with plaintiff's contract with German Motors as well as plaintiff's ability to sell other related auto body repair products, defendant entered into a contract to sell paint to German Motors. *Id.* ¶¶ 11–12, 19–20.

In its original complaint, plaintiff alleged four causes of action against defendant: (1) interference with contract; (2) interference with prospective economic advantage; (3) anticompetitive activity in violation of California's unfair competition law; and (4) unlawful tying agreement in violation of Section 16724 of the California Business and Professions Code. *See* Compl. (Doc. 1). *Id.* Defendant moved for judgment on the pleadings as to all four claims.

The Court denied the motion with respect to the first three claims, and dismissed the fourth claim. Order (Doc. 33). In the original complaint, plaintiff had alleged that defendant "forced" German Motors to use BMW paint, but did not explain the source of the coercion. *Id.* The complaint failed to explain how two products were tied, and therefore failed to allege the existence of a tying agreement. *Id.* The Court granted plaintiff leave to amend. *Id.*

In its amended complaint, plaintiff alleges the following. Defendant requires any body shop or refinisher to buy BMW-branded paint in order to become certified as a CCRC. FAC ¶ 55. Defendant forced German Motors to enter into a written agreement that requires German Motors to use BMW paint on any BMW car painted by German Motors. *Id.* ¶ 10, Ex. B. Defendant requires purchases of BMW paint as a condition to obtain CCRC status. *Id.* ¶ 57. Although participation in the CCRC program is voluntary, the practical consequences of not being certified are so dire that a German Motors representative and the representative of another company stated in deposition that it is not an option. *Id.* ¶ 56. BMW-branded paint is made by DuPont and is basically the same as the paint plaintiff had been selling to German Motors. *Id.* ¶¶ 52, 57. Plaintiff claims that defendant has no evidence that its paint is substantively different or better than Spies Hecker branded paint, and that there are no quality of service, quality of product, or other quality justifications for its requirement. *Id.* ¶ 57. Plaintiff also clarifies that its claim is for a violation of Section 16726 and Section 16727 of the California Business and Professions Code.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed but within such time as to not delay the trial, any party may move for judgment on the pleadings." The legal standard for Rule 12(c) is virtually identical to the standard for a motion to dismiss under Rule 12(b)(6). *See Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

For a motion under either rule, the question presented is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

While Rule 12(c) of the Federal Rules of Civil Procedure does not expressly provide for partial judgment on the pleadings, neither does it bar them; it is common to apply Rule 12(c) to individual causes of action. *See Moran v. Peralta Community College Dist.*, 825 F. Supp. 891, 893 (N.D. Cal. 1993). "Courts have discretion to grant leave to amend in conjunction with 12(c) motions, and may dismiss causes of action rather than grant judgment." *Id.*

When a court finds the pleadings deficient, it must then decide whether to grant leave to amend. In general, leave to amend is only denied if it is clear that amendment would be futile and "that the deficiencies of the complaint could not be cured by amendment." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (per curium).

**ANALYSIS**

Defendant has once again moved for judgment on the pleadings regarding plaintiff's fourth claim for relief.

Plaintiff's fourth claim for relief is brought under two provisions of the Cartwright Act: Section 16726 and Section 16727. The California courts have explained that

> The purpose of the Cartwright Act is to protect and foster competition by preventing combinations and conspiracies which unreasonably restrain trade. Section 16720 of the Cartwright Act defines a "trust" as a "combination of capital, skill or acts by two or more persons" for numerous specified purposes including "(a) [t]o create or carry out restrictions in trade or commerce" and "(c) [t]o prevent competition in manufacturing,

3

1   making, transportation, sale or purchase of merchandise, produce or any commodity."
2   Except as otherwise stated in the Cartwright Act, "every trust is unlawful, against public policy and void."  Bus. & Prof. Code, § 16726.

3   *Morrison v. Viacom, Inc.*, 52 Cal. App. 4th 1514, 1527 (1997) ("*Morrison I*") (some citations omitted)

4   (alterations in *Morrison*).  Section 16727 then expressly prohibits illegal tying arrangements.

5   Allegations of illegal tying agreements can be brought under Section 16726 or the narrower

6   Section 16727.  *See Corwin v. LA Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 856 & n.12 (1971);

7   *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534 (1998) ("*Morrison II*").  An unlawful tying agreement

8   generally occurs where the sale of one good is conditioned on the sale of a different good.  *Eastman*

9   *Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461 (1992) (citation omitted).  To state a claim

10  for an unlawful tying agreement, the plaintiff must allege both that: "a tying agreement, arrangement

11  or condition existed whereby the sale of the tying product was linked to the sale of the tied product . .

12  ."; and "the complaining party sustained pecuniary loss as a consequence of the unlawful act."  *Morrison*

13  *II*, 66 Cal. App. 4th at 541-542 (citations omitted).  The plaintiff must also allege that either, "the party

14  had sufficient economic power in the tying market to coerce the purchase of the tied product"; or "a

15  substantial amount of sale was affected in the tied product . . . ."  *Id.* at 542.  A tying arrangement is per

16  se illegal under the Cartwright Act where either of these latter elements is proven.  *Id.*; *see also*

17  *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 975 (9th Cir. 2008)

18  Here, plaintiff has alleged (1) that defendant conditioned the CCRC certification of repair shops

19  on the purchase of BMW-brand paint; (2) this caused German Motors to repudiate its contract with

20  plaintiff, which caused plaintiff to lose money; and  (3) it is not feasible to be in the business of

21  repairing BMW cars without being certified by defendant as a CCRC.  According to the amended

22  complaint, the CCRC certification is the tying product, and paint is the tied product.

23  Defendant first argues that the CCRC certification and the BMW-brand paint are one singular

24  product, and therefore the claim fails as a matter of law under both Section 16726 and Section 16727.

25  Defendant argues that "CCRC serves as a conduit through which the trademarked product (here, BMW-

26  brand paint) flows to the consumer."  Mot. at 5 (Doc. 38).  Defendant argues that the complaint itself

27  effectively states that "BMW owners frequent body shops with BMW CCRC status because the BMW

28  trademark is 'inextricably interrelated' with <u>high quality</u> BMW-brand products, specifically BMW-

4

brand paint." *Id.* at 6 (emphasis original). "Based on the facts alleged by [plaintiff], the BMW CCRC program is nothing more than a designation intended to communicate to discerning consumers that a body shop knows how to use and, in fact, uses BMW-brand paint." *Id.* at 7.

It appears from the complaint that the alleged tying product—CCRC certification—is analogous to the branding aspect of a franchise agreement. "Franchises, almost by definition, necessarily consist of 'bundled' and related products or services," which are "not separate products." *See Rick-Mik Enters.,* 532 F.3d at 974. "'Where the challenged aggregation is an essential ingredient of the franchised system's formula for success, there is but a single product and no tie in exists as a matter of law.'" *Id.* (quoting *Principe v. McDonald's Corp.*, 631 F.2d 303, 309 (4th Cir. 1980)). Where the tying product is a trademark—often the branding aspect of the franchise agreement—"whether a trademark may appropriately be regarded as a separate product requires an inquiry into the relationship between the trademark and the products allegedly tied to its sale." *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1353 (9th Cir. 1982).

Some reasonable inferences to be drawn from plaintiff's amended pleadings are that (1) the CCRC certification is a designation relating to the quality of a repair shop generally, (2) the requirement that CCRC shops use BMW-brand paints is new, and (3) BMW-brand paints and the paints that were being supplied by plaintiff are essentially identical in terms of both quality and origin. One possible reasonable conclusion to be drawn therefrom is that the use of BMW-brand paints is not an essential ingredient of defendant's formula for success.

Similarly, plaintiff's complaint survives the alternative purchaser-demand test, which requires that there be "a sufficient demand for the purchase of the tied product separate from the tying product to identify a distinct product market." *Rick-Mic*, 532 F.3d at 975; *see also Corwin*, 4 Cal. 3d at 858–59 ("[T]he following factors should be taken into account: (1) Whether competitors offer to sell the products or services separately or only as a unit. (2) Whether the combined product or service is composed of varying assortments of component parts. (3) Whether buyers are or can be charged separately for the allegedly separate products or services. (4) Whether the defendant ever sells or offers to sell the products or services separately."). The complaint alleges that a distinct market in fact existed until 2010.

United States District Court
For the Northern District of California

Defendant next argues that the narrower Section 16727 claim fails, because the CCRC designation is not a tangible item.  Defendant highlights the language of the statute, which prohibits the tying of contracts to the lease or sale of "goods, merchandise, machinery, supplies, [and] commodities." Cal. Bus. & Prof. Code § 16727.   Defendant also cites *Morrison II*, where the California Court of Appeal held that the provision of cable television was a "service" and thus could not be a tying product. *See* 66 Cal. App. 4th 534, 546–48.

As discussed above, a reasonable inference to be drawn from the complaint is that the CCRC designation is akin to a trademark.  Defendant does not distinguish cases such as *Krehl* that appear to accept the possibility that the granting of permission to use a trademark can constitute a tying product.

In its reply brief, defendant argues that plaintiff's Section 16726 claim fails, because plaintiff failed to allege the existence of a relevant market, and failed to allege that defendant's actions adversely impacted competition in that market.  The argument is that if plaintiff has failed to state a claim under 16727, then it has failed to state a claim for a per se illegal antitrust action, and therefore plaintiff must allege that defendant's actions were unreasonable in order to state a claim under 16726.

A tying arrangement can be per se illegal under either Section 16726 or 16727 if a defendant "had sufficient economic power in the tying market to coerce the purchase of the tied product" or "a substantial amount of sale was affected in the tied product."  *Morrison II*, 66 Cal. App. 4th at 542.  In that case, the rule of reason does not apply, and the plaintiff need not separately prove a resulting adverse effect on competition in the market.  *See Rick-Mic*, 532 F.3d at 971.

In this case, plaintiff has alleged the third element of a tying arrangement:  that defendant has market power in the tying product.  Defendant is correct that the tying market cannot be described as the market for certifying CCRC shops.  *See Mozart Co. v. Mercedes-Benz of North America, Inc.*, 593 F. Supp. 1506, 1518 n.17 (N.D. Cal. 1984).  It appears from plaintiff's complaint, however, that the allegation is that tying market is the market for repairing BMW brand cars (or for repairing cars generally), and that within that market defendant has a monopoly over a product that is uniquely

**United States District Court**
For the Northern District of California

attractive—the CCRC branding.[1] *See U. S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 621 n.14 (1977) ("Whenever there are some buyers who find a seller's product uniquely attractive, and are therefore willing to pay a premium above the price of its nearest substitute, the seller has the opportunity to impose a tie to some other good."); *see also Mozart*, 593 F. Supp. at 1519. Because plaintiff has alleged all of the elements of a per se illegal tying arrangement, the Court need not address defendant's argument that the complaint lacks any allegation that defendant's actions adversely impacted competition in the market.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is DENIED. (Doc. 38.)

**IT IS SO ORDERED.**

Dated: April 19, 2011

SUSAN ILLSTON
United States District Judge

---

[1]     In *Exxon Corp. v. Superior Court*, 51 Cal. App.4th 1672 (1997), which is cited by defendant, the court explained that "the relevant market" for the purposes of a rule of reason analysis "is composed of products that have reasonable interchangeability for the purpose for which they are produced." *Id.* at 1682 (citing *United States v. Du Pont & Co.* 351 U.S. 377, 402 (1956)). In *Exxon*, the court found that, as a matter of law, "the reasonable interchangeability for the purpose for which gasoline is produced (use in consumers' motor vehicles) mandates the relevant market to be all gasoline, not the wholesale market for one brand of gasoline." *Id.*
        Assuming the same rule applies for defining the relevant market in the case of an alleged per se illegal tying arrangement, the holding in *Exxon* does not compel the Court to determine at this time whether the relevant market is the market for repairing BMW brand cars or the market for repairing cars generally. *See Corwin*, 4 Cal. 3d at 855 (explaining that the market definition—whether it be all classes of legal advertisements or notices of trustee sales only—was a mixed question of law and fact that could not be resolved on the limited record before it).